*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0644**

Susanna D. Smith, et al.,
Respondents,

vs.

Wells Concrete Products Co.,
Appellant.

**Filed February 2, 2015
Reversed
Reyes, Judge
Dissenting, Chief Judge Cleary**

Faribault County District Court
File No. 22CV12299

Paul D. Peterson, Jason L. DePauw, Harper & Peterson, P.L.L.C., Woodbury, Minnesota (for respondents)

James T. Martin, Julian C. Janes, Gislason, Martin, Varpness & Janes, P.A., Edina, Minnesota (for appellant)

Considered and decided by Johnson, Presiding Judge; Cleary, Chief Judge; and Reyes, Judge.

**U N P U B L I S H E D   O P I N I O N**

**REYES**, Judge

In this appeal from a judgment following a jury trial of respondents' negligence claims, which arose out of a construction workplace injury to an independent contractor, appellant argues that (1) the district court erred by denying its motion for judgment as a

matter of law because appellant did not owe a duty of care to respondent Susanna Smith, an independent contractor hired by appellant; (2) a new trial is required because the district court allowed evidence of remedial measures, instructed the jury on premises liability and failed to instruct on primary assumption of the risk, and because the verdict is against the great weight of the evidence; and (3) the district court erred by denying appellant's motion for a collateral-source offset. Because we agree with appellant that it did not owe a duty of care to respondent Susanna Smith and that respondents failed to prove causation, we reverse.

## FACTS

This case arises from a worksite accident that occurred on December 19, 2008. Respondent Susanna Smith (Smith)[1] was a subcontractor hired by appellant Wells Concrete Products Co. (Wells) to paint its new production facility. Smith fell from a height of ten to twelve feet while she was painting and suffered substantial injuries. Following a four-day trial, a jury found that Wells was negligent and that its negligence was the direct cause of Smith's accident. The jury also found Smith negligent. The jury apportioned 60% of the fault to Wells and 40% to Smith.

The production facility where the accident took place is owned and operated by Wells. Wells served as its own general contractor during the construction of its new facility. Wells had its own employees working on the project and also hired various other subcontractors to work on site. Smith was hired by Wells to paint the facility.

---

[1] Respondent William Smith's claim of loss of consortium is not at issue on appeal.

2

At the time Smith was hired by Wells, she had twelve years of experience as a painter and was doing business as a sole proprietor. In the course of her career, Smith regularly used a mechanized personnel lift, scaffolding equipment, paint-spraying equipment, an extension ladder, and fall-protection devices such as a harness. Smith received safety training from the Occupational and Safety Hazards Administration (OSHA) regarding lifts and scaffolding equipment. Smith's painting jobs were mostly residential prior to her painting the Wells facility. Smith provided her own equipment for the job at the Wells facility, with the exception of a scissor lift, which was provided by Wells. Smith never requested any assistance from Wells nor did Smith ever request the use of any other equipment. Smith felt she was qualified to do the paint job at the Wells facility. Throughout the course of the job, Smith hired her brother and a few other people to assist her.

Smith started painting the facility in November 2008. Smith was not required to check in with anyone while she was at work. She was entirely free to do the work in any way she thought appropriate; she was free to decide whether to hire others to assist her, what equipment to use and when to use it, and when to start and end a workday. The only requirement imposed by Wells was that there could be no individual working alone at any time in the building in the event of an accident. Wells also provided guidelines as to the type of paint, color of paint, and the dates for starting and completing different phases of the job. Other than those provisions, Smith had discretion and authority to complete the job the way she wanted. There was no supervision from Wells, and Smith testified that she did not expect any supervision.

3

Smith began by painting the lunchroom area, bathroom, and the offices on the first floor of the facility. Paul Nelson, a Wells employee, notified Smith when certain areas were ready for her to start painting. Smith used the scissor lift provided to her by Wells to paint some of these areas.

On December 18, Smith began painting the ceiling and walls above a narrow corridor between the conference rooms and offices. Smith testified that she did not have any discussions with Nelson regarding safety railings or any other safety-related issues when she began painting these areas. The first floor rooms and the corridor were about ten to twelve feet in height. The roof over the office area was covered in plywood to form an "office deck," so that people could stand on the plywood to work on the walls and ceiling above the offices. Similarly, the roof area above the conference room was also covered in plywood to form a "conference-room deck." There were no railings along the edges of the office deck or the conference-room deck overlooking the corridor. The wall from the decks to the ceiling was an additional ten to twelve feet high. The corridor below divided the conference-room deck and the office deck.

Smith did not believe that she could navigate the scissor lift, provided to her by Wells, into the narrow part of that corridor. So instead, Smith decided to lay three planks from her scaffolding set across the opening above the corridor. The scaffolding planks made a makeshift bridge across the top of the corridor, connecting the conference-room deck and office deck. Below the planks was a ten-foot drop to the ground that was plainly visible. Despite testimony that the scissor lift could have been used in the corridor, Smith maintains that the makeshift bridge was her only option to paint that area.

4

Smith testified that it appeared to her to be a "safe way to do the job." Smith knew that, when using scaffolding equipment, safety railings were required, even if she was just using the planks from the scaffolding equipment. Smith did not put up any safety railings on the makeshift bridge that she made out of her scaffolding planks. Smith testified that at no point did she make a request to Wells for any kind of help or safety equipment.

On December 19, Smith, accompanied by her brother Jeremiah and her daughter Christine, arrived at the facility to paint. Smith was still in the phase of her work that required her to paint the roof deck areas above the office and conference room. The accident happened soon after the three began painting. Jeremiah was spraying paint onto the ceiling and walls, and Smith was rolling the paint onto the ceiling and the walls after him. Christine had a small roller and was following behind Smith to roll the paint onto the smaller areas when suddenly Christine heard a sound. She looked over and did not see Smith. Christine was standing on the conference-room deck and observed that Jeremiah had already crossed over the planks above the corridor and was on the other side, above the office deck. Jeremiah and Christine both ran to the edge of the roof decks and saw Smith lying unconscious on the ground below. Neither Jeremiah nor Christine witnessed what happened right before Smith fell. Christine testified that Smith had not completely crossed over the planks to the other roof deck that Jeremiah was on before the accident happened.

Smith testified that the last thing she remembered was that she was "within a couple feet of the hole" rolling paint onto the ceiling. Smith did not have any recollection of what happened after that. She testified that her next memory was waking

up in a hospital. Smith testified that she believed she could have accomplished painting that part of the facility if there had been a railing system and no bridge above the corridor. Although it would have been possible, Smith stated that any railing on the edge of the roof deck areas would have made it more difficult for her to paint.

Following the incident, Wells safety director Jeff Lazar investigated the accident. Lazar created an "Accident Report" describing the details of the accident. To assist with his investigation, Lazar interviewed a few Wells employees. Lazar did not interview Smith, Christine, or Jeremiah regarding the incident. Lazar concluded in his report that Smith fell because of "unsafe conditions." After Smith's fall, Wells directed Jon Middendorf, an employee of Wells, to build a temporary guardrail along the exposed edge of the roof decks where Smith had been working. Middendorf testified that prior to that, he had constructed two other safety-railing systems over a different elevated area in the facility at the direction of Wells. Over Wells's objection at trial, the jury heard evidence about Wells's construction of the temporary guardrail following Smith's accident. A large mock-up of the railing was also present in the courtroom for use as an illustrative exhibit.

At trial, Smith's expert witness Ivan Russell, a former director of Minnesota OSHA, provided testimony concerning the federal OSHA. Russell testified that an OSHA regulation, 29 C.F.R. § 1926.501(b)(1) (2014), requires that an employer must provide a temporary railing or other fall protection equipment for employees working from elevated platforms at a height of six feet or more. There is no dispute that Smith was an independent contractor and not an employee of Wells. Despite this fact, Russell

6

testified that the rule applied to Wells for a non-employee's injury either as a "creating," "exposing," "correcting," or "controlling" employer in accordance with OSHA's "multi-employer citation policy." Wells's objection to this testimony was overruled. Russell testified as to what, in his opinion, constitutes reasonable care on a worksite. Russell also testified that in his opinion, Smith's fall was caused by Wells's negligence in failing to construct a temporary safety guardrail. Russell admitted that his opinion was not based on any knowledge as to where Smith was standing when she fell.

Smith suffered substantial injuries as a result of her fall. Smith had three separate surgeries for her multiple spinal fractures and required extensive physical therapy. The cost of her medical treatment up to the date of trial was over $388,000.00. Dr. Miller, Smith's medical witness and treating physician until 2009, testified as to the types and extent of treatment Smith may need in the future. Dr. Miller did not give an estimate as to what the costs of those treatments would be although she testified that it is reasonable to use Smith's past medical expenses to project her future medical costs.[2]

At the close of Wells's case, Wells moved for judgment as a matter of law. The district court denied the motion. Before closing arguments, the parties made their arguments concerning jury instructions. Wells moved to dismiss Smith's claim based on a premises-liability theory. The court denied the motion and instructed the jury as to premises liability. Wells next requested jury instructions concerning the doctrine of

---

[2] Wells raised issues relating to the award of damages on appeal. However, because the issues we address are dispositive, we do not reach the merits of those issues or the other ones raised by Wells.

7

primary assumption of risk. The district court denied the request and concluded that the instruction did not apply.

After the jury verdict, Wells again moved for judgment as a matter of law or a new trial. The district court denied the motion. Wells also filed a motion for collateral-source calculations and a reduction of award. This motion was also denied. This appeal follows.

## D E C I S I O N

Wells argues that the district court erred in denying its motion for judgment as a matter of law. "Judgment as a matter of law is appropriate when a jury's verdict has no reasonable support in fact or is contrary to law." *Kidwell v. Sybaritic, Inc.*, 749 N.W.2d 855, 861 (Minn. App. 2008), *aff'd*, 784 N.W.2d 220 (Minn. 2010). "Courts must view the evidence in the light most favorable to the nonmoving party and determine whether the verdict is manifestly against the entire evidence or whether despite the jury's findings of fact the moving party is entitled to judgment as a matter of law." *Longbehn v. Schoenrock*, 727 N.W.2d 153, 159 (Minn. App. 2007) (quotation omitted). "The jury's verdict will not be set aside if it can be sustained on any reasonable theory of the evidence." *Id*. (quotation omitted). In applying this standard, "the court may not weigh the evidence or judge the credibility of the witnesses." *Lamb v. Jordan*, 333 N.W.2d 852, 855 (Minn. 1983). However, judgment as a matter of law should be granted in those cases where the verdict is "manifestly against the entire evidence" or where "it would be contrary to the law applicable to the case." *Jerry's Enters., Inc., v. Larkin, Hoffman, Daly & Lindgren, Ltd.,* 711 N.W.2d 811, 816 (Minn. 2006) (quotation omitted). "The

8

denial of a motion for judgment as a matter of law presents a legal question, which is subject to de novo review." *Kidwell*, 749 N.W.2d at 861.

"The basic elements necessary to maintain a claim for negligence are (1) duty; (2) breach of that duty; (3) that the breach of duty be the proximate cause of plaintiff's injury; and (4) that plaintiff did in fact suffer injury." *Schmanski v. Church of St. Casimir of Wells*, 243 Minn. 289, 292, 67 N.W.2d 644, 646 (1954). We will address duty and causation in turn.

## I.      Duty

Wells first argues that Smith's claim of negligence is barred as a matter of law on the ground that Wells did not owe a duty of care to Smith. (App Br 14-23). "[T]he existence of a duty . . . is a legal question to be determined by the judge, not the jury." *Balder v. Haley*, 399 N.W.2d 77, 81 (Minn. 1987). There are two recognized duties of care that are raised in this appeal. One is based on the "retained control" rule and the other is based on Wells's status as a landowner ("premises liability").

### A.      Retained control

In *Sutherland v. Barton*, 570 N.W.2d 1 (Minn. 1997), the Minnesota Supreme Court addressed the issue of an employer's liability to the employee of an independent contractor. In *Sutherland*, the employer Waldorf Corporation (a paper plant) hired contractor Muska Electric Company (an electrical contractor) to perform electrical work in a Waldorf's manufacturing plant. *Sutherland*, 570 N.W.2d at 3. Part of the job required working near live exposed buss bars conducting an electrical current. *Id.* Muska believed the task could be completed safely with the power still on. As a result,

9

Muska did not request Waldorf to shut off the power in the area. *Id.* It was general knowledge to Muska electricians that live buss bars could be deadly. *Id.*

Muska's employee Sutherland was selected to do the work as he was an experienced electrician who was aware of the danger of working near live buss bars. *Id.* at 3-4. One morning while Sutherland was working, he took out his metal measuring tape, which touched the live buss bars. Tragically, Sutherland suffered a high voltage electric shock leading to his death. *Id.* at 4. Based on a finding that Waldorf did not "retain the requisite level of control" necessary to warrant imposition of liability under a direct liability theory, the supreme court determined that Waldorf was not directly liable to the trustee for the heirs of Sutherland. *Id.* at 6. In reaching this conclusion, the court analyzed what level of control was necessary under the "retained control" theory. *Id.* at 56. The *Sutherland* court relied on the Restatement (Second) of Torts § 414, comment c:

> It is not enough that [the company] has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports to make suggestions or recommendation which need not necessarily be followed, or to prescribe alterations and deviations . . . . There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.

Restatement (Second) of Torts § 414 cmt. c (1965). The supreme court determined that although "Waldorf had the right to order work stopped, to inspect its progress, to make suggestions, and to prescribe changes on the project," this alone was insufficient to impose direct liability. *Sutherland*, 570 N.W.2d at 6. Moreover, the supreme court noted that Muska decided how Sutherland was to perform his tasks the day of the accident, how to protect the work area, was a specialist in electrical work, and did not insist that

Waldorf shut off the power to the buss bars before Sutherland proceeded with the job. *Id*. For these reasons the supreme court concluded that Waldorf did not retain the detailed control necessary to warrant the imposition of direct liability for Sutherland's injuries. *Id.*

This case is no different. Here, both Smith and employees from Wells testified that Smith was free to do the work however she wanted. Smith did not have any direct or indirect supervision from Wells. Smith did not have to check in with Wells when she arrived at the job site, nor did Wells instruct Smith on how to perform her specific tasks. It is clear that no such retention of the right of supervision was held by Wells. To the contrary, Smith was the one who directed the method by which the painting would be completed, and Smith was the one who determined the amount of assistance required. Moreover, Smith was the person who decided to use her scaffolding as planks to bridge the gap between the roof decks without a safety railing. Smith testified that she did not ask Wells for help or for safety equipment. Although Wells had knowledge that Smith had to paint the ceiling of the facility, Wells did not direct Smith on how to complete this task. Similar to Sutherland, Smith was hired for her experience and expertise. The control that Wells had to inspect Smith's work and to ensure project deadlines were met is insufficient to impose direct liability on Wells based on a "retained control" theory of liability. Wells did not owe a duty of care to Smith under this theory as a matter of law.

11

## B.      Premises liability

We next address whether Wells owed a duty of care to Smith as a landowner. *See Conover v. Northern States Power Co.*, 313 N.W.2d 397, 401 (Minn. 1981) ("Even where the employer retains no control, he may still owe a duty of care, as a possessor of land, to persons coming on the premises, including the employees of an independent contractor.").

As a general rule, a property owner "has a duty to use reasonable care for the safety of all entrants upon the premises." *Olmanson v. LeSueur County*, 693 N.W.2d 876, 880 (Minn. 2005). This includes the employees of an independent contractor. *Conover*, 313 N.W.2d at 401. "Reasonable care includes the duty to inspect and repair the premises and, at a minimum, to warn persons using the premises of unreasonable risks of harm." *Sullivan v. Farmers & Merchs. State Bank of New Ulm*, 398 N.W.2d 592, 594 (Minn. App. 1986), *review denied* (Minn. Mar. 13, 1987).

But a landowner's common-law duty to inspect, repair, and warn is not absolute. *Olmanson*, 693 N.W.2d at 881. Minnesota has adopted Restatement (Second) of Torts § 343A(1) (1965), which states that landowners are not liable to their invitees for physical harm that is caused by known or obvious dangers, unless the landowner should anticipate the harm despite such knowledge or obviousness. *Sutherland*, 570 N.W.2d at 7. "A possessor of land, however, has no duty to an invitee where the anticipated harm involves dangers so obvious that no warning is necessary." *Baber v. Dill*, 531 N.W.2d 493, 496 (Minn. 1995). "The rationale underlying this rule is that no one needs notice of what he knows or reasonably may be expected to know." *Id.* (quotation omitted).

12

Moreover, "[a] landowner has no duty to an invitee to warn or make safe known and obvious conditions when that invitee has assisted in creating those conditions." *Id.*

There is no dispute that the danger present in this case was known and obvious to Smith. However, even if this danger was known and obvious, Wells may still be liable for Smith's injuries if the harm should have been anticipated by Wells. This exception "is a crucial qualifier to the general rule." *Sutherland*, 570 N.W.2d at 7. "A reason to anticipate the harm may arise when the landowner 'has reason to expect that the invitee will proceed to encounter the known or obvious danger because to a reasonable man in his position the advantages of doing so would outweigh the apparent risk.'" *Id.* (quoting Restatement (Second) of Torts § 343A cmt. f (1965)). Generally, whether the possessor could anticipate the danger is a fact question. *Olmanson*, 693 N.W.2d at 881. Wells argues that the "qualifier" to the rule is inapplicable here. We agree.

In *Sutherland*, the supreme court concluded, that as a matter of law, Waldorf did not owe a duty to protect Sutherland from harm by the known and obvious danger of working near exposed live buss bars and granted summary judgment to Waldorf. 570 N.W.2d at 78. The supreme court determined that, because Sutherland had expertise as an electrician, and this expertise was the exact reason Waldorf hired Muska, it was entirely reasonable for Waldorf to expect Muska to take the necessary safety precautions and require its employees to follow proper guidelines. *Id.* at 7. The supreme court summarized, "[a]ccordingly, Waldorf had no reason to anticipate that Muska, its independent contractor, and Sutherland, its contractor's employee, would proceed to

13

encounter the danger . . . without taking the necessary safety precautions." *Id.* We see no reason why a similar conclusion should not be reached here.

Smith was hired because she had experience and expertise as a painter. At the time of her fall, Smith had been working in the painting business for twelve years. Smith testified that she also had experience with safety training and received training from OSHA. Smith had experience using safety equipment, including fall protection equipment such as a harness. Indeed, Smith used some of this equipment while painting other areas of the facility. Under these circumstances, it was entirely reasonable for Wells to expect Smith to take the necessary safety precautions or, at minimum, to notify Wells if she needed additional equipment to complete the job safely.

Moreover, Smith was the one that opted to use her scaffolding planks as a bridge across an open area with a ten-foot drop rather than use the scissor lift Wells provided her or ask Wells to install a safety railing. There was no reason for Wells to anticipate the danger that Smith herself created, when they provided her with a scissor lift. Smith had complete control of how to paint the facility, what equipment to use, and when to use it. Thus, similar to the employer in *Sutherland*, Wells had no reason to anticipate that Smith would proceed to encounter the danger in the way that she did. The supreme court has held that "a landowner has no duty to an invitee to warn or make safe known and obvious conditions when that invitee has assisted in creating those conditions." *Baber*, 531 N.W.2d at 496. Because Smith assisted in creating the dangerous condition, this court will not impose a duty of care on Wells. *See id.* ("To hold a landowner has a duty to warn an invitee of danger created, in part, by that individual is untenable.").

14

Even when viewed in the light most favorable to the verdict, the jury could not have reasonably concluded that Wells should have anticipated the harm despite the knowledge or obviousness of the dangerous condition. "Judgment as a matter of law is appropriate when a jury's verdict has no reasonable support in fact or is contrary to law." *Kidwell*, 749 N.W.2d at 861. Here, Smith has failed to show that Wells owed Smith a duty of care under either theory. Thus, Wells was entitled to judgment as a matter of law.[3]

## II.    Causation

Smith's claim also fails as a matter of law because she failed to prove the causation element. Smith did not introduce any evidence that her injury was caused by Wells's failure to construct a temporary railing at the edge of the rooftop decks. Thus, the district court erred in denying Wells's motion for judgment as a matter of law.

---

[3] Even though it is not necessary to consider application of the primary assumption-of-the-risk doctrine, we nonetheless observe that Smith voluntarily encountered the obvious and well-known risk of falling from a roof deck that was elevated ten feet above the ground when she made the decision to paint the ceiling without using any fall protection equipment, or requesting any additional safety equipment from Wells. *See Goodwin v. Legionville School Safety Patrol Training Center*, 422 N.W.2d 46, 50 (Minn. App. 1988) (applying primary assumption of risk doctrine to bar claims for injuries that arose out of a fall from a roof as a matter of law where falling off a roof was a well-known, obvious, and incidental risk to the activity of roofing, and where plaintiff, who had experience in shingling roofs and who was familiar with safety precautions which could be used while roofing, went up on a roof voluntarily, knowing that all roofs were hazardous and fell), *review denied* (Minn. June 23, 1988). Thus, Smith's claim is also barred by the doctrine of primary assumption of risk. *Olson v. Hansen*, 299 Minn. 39, 44, 216 N.W.2d 124, 127 (1974) (determining that "when parties have voluntarily entered a relationship in which plaintiff assumes well-known, incidental risks[] . . . the defendant has no duty to protect the plaintiff").

In this case, there was no evidence presented to support Smith's claim that the lack of a safety guardrail was the direct and proximate cause of her injury. Smith herself testified that she could not remember the incident—only that she was walking toward the opening above the corridor. Smith could not remember where she was standing when she fell. Smith's daughter Christine provided similar testimony. Christine testified that she did not see Smith right before she fell and that she did not know where Smith was standing right before she fell. Christine testified that the last time she saw Smith, she was walking towards the scaffolding planks that were laid across the open corridor. Christine testified that Jeremiah, whom Smith was following, had already crossed over the makeshift bridge and was already on the other side.[4] There was no evidence presented to support Smith's claim. Indeed, Smith introduced no evidence whatsoever that her fall was caused by the lack of temporary railings on the rooftop decks.

Smith relies on the testimony of her expert witness, Ivan Russell who testified that, despite his lack of knowledge as to where Smith was standing before she fell, he believed the lack of a safety guardrail was the direct and proximate cause of Smith's injury. Russell, however, did not provide testimony as to how he reached that conclusion. Instead, Russell's testimony on this key issue consisted of a generalized, conclusory statement that does not support Smith's claim. Moreover, Russell's opinion had no factual basis because he did not know where Smith was standing when she fell.

"Where the evidence is such that a trier of fact can do no more than guess or [engage in] conjecture as to which of several acts was in fact the efficient cause, the

---

[4] Jeremiah, the only other person who could have witnessed the accident, did not testify.

16

plaintiff has failed to prove that the defendant's breach caused the injury." *Schweich v. Ziegler, Inc.,* 463 N.W.2d 722, 729 (Minn. 1990). Absent any competent evidence on causation, the jury was left to guess as to what was in fact the cause of Smith's fall. Smith failed to prove that any negligence by Wells was the direct and proximate cause of her injury.

Given our disposition, we do not address appellant's remaining arguments that (1) the district court erred in allowing evidence of remedial measures taken after the accident to be presented to the jury; (2) the district court erred in instructing the jury on premises liability and failing to instruct on primary assumption of the risk; and (3) the verdict is against the great weight of the evidence. Similarly, we do not reach appellant's argument that the district court erred by denying appellant's motion for a collateral-source offset.

**Reversed.**

**CLEARY,** Chief Judge (dissenting)

I respectfully dissent from the majority's decision. This panel is not entitled to overturn the jury's verdict "if it can be sustained on any reasonable theory of the evidence." *Longbehn v. Schoenrock*, 727 N.W.2d 153, 159 (Minn. App. 2007) (quotation omitted). The supreme court instructs us to provide due regard to the superior opportunity of the trial court to judge the credibility of witnesses. *In re Silicone Implant Ins. Coverage Litig.*, 667 N.W.2d 405, 415 (Minn. 2003). Here, the jury concluded that all four of the elements of negligence were present, including the element requiring that appellant owed a duty of care to respondent. The majority now holds that no such duty of care existed.

Premises liability constitutes a theory upon which the jury could have reasonably based its conclusion that appellant owed a duty of care to respondent. *Conover v. N. States Power Co.* states that employers who retain no control over a project may still owe a duty of care "as a possessor of land, to persons coming on the premises, including the employees of an independent contractor." 313 N.W.2d 397, 401 (Minn. 1981). A landowner of improvements to real property has a duty of reasonable care to persons using the premises, which includes the duty to "inspect and repair the premises and, at a minimum, to warn persons using the premises of unreasonable risks of harm." *Sullivan v. Farmers & Merchs. State Bank of New Ulm*, 398 N.W.2d 592, 594 (Minn. App. 1986), *review denied* (Minn. Mar. 13, 1987).

A landowner is not typically liable for physical harm caused by dangers that are known or obvious to invitees. *Baber v. Dill*, 531 N.W.2d 493, 495-96 (Minn. 1995). However, the landowner's duty of care arises even as to known or obvious dangers where the landowner "has reason to expect that the invitee will proceed to encounter the known or obvious danger because to a reasonable man in his position the advantages of doing so would outweigh the apparent risk." *Sutherland v. Barton*, 570 N.W.2d 1, 7 (Minn. 1997) (quoting Restatement (Second) of Torts § 343A, cmt. f (1965)). Whether the landowner should anticipate that the invitee will encounter the danger is a question of fact for the jury. *Olmanson v. LeSueur Cnty.*, 693 N.W.2d 876, 881 (Minn. 2005).

Here, the landowner built safety railings to ensure the safety of other subcontractors in several other areas of the project, including at an elevated catwalk with an exposed drop-off. The landowner built the railings, not because the subcontractors sought such protection (there was no evidence they made any such request), but because the landowner anticipated the harm despite the knowledge or obviousness of the condition. Indeed, the landowner quickly built a guardrail along the edge of the roof decks where respondent fell *after* she fell. The evidence at trial was sufficient for the jury to find a duty on the part of the landowner to anticipate that harm in this instance and to find a breach of that duty.

As to causation, the jury's verdict that the failure of the landowner to anticipate the harm was a direct cause of the respondent's injuries is supported by a preponderance of the evidence. Respondent was last seen walking toward the scaffolding planks that laid across the open corridor without a safety railing. Moments later, she was on the

ground, severely injured. As the landowner's own accident report concludes: "Unsafe Conditions: There was no apparent fall protection or railings where the painters were working."

Finally, as to primary assumption of the risk, respondent, by her actions, did not relieve the landowner from its duty of care to provide a safe workplace. Whether someone has primarily assumed a risk depends on plaintiff's knowledge and appreciation of the risk, and a choice to avoid the risk but voluntarily choosing to take it. *Schneider ex rel. Schneider v. Erickson*, 654 N.W.2d 144, 149 (Minn. App. 2002). Since there are questions of fact, "[w]hether a party has primarily assumed the risk is usually a question for the jury, unless the evidence is conclusive." *Id.* at 148. Here, respondent was doing her best to complete the painting she had contracted to perform under the working conditions with which she was confronted. Based on the testimony of respondent, and on other evidence offered at trial, the jury could reasonably have found that respondent did not assume the risk by doing what she was hired to do, paint the ceiling to landowner's satisfaction.

I believe that the jury could have reasonably concluded that it was foreseeable to the landowner that respondent would encounter the danger created by the exposed roof deck edges while painting and that the landowner should have anticipated the danger to respondent. The majority's opinion does not afford the appropriate level of deference to the jury's verdict. Because a reasonable theory supports the jury's verdict, we should not overturn it.